**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 07 CR 447 |
| | ) | |
| DANIEL LITTLEDALE | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Daniel Littledale is charged with distribution, receipt, and possession of child pornography. When questioned by law enforcement agents, Littledale confessed to that he had sent and received child pornography. Littledale has moved to suppress his confession. For the following reasons, the Court denies Littledale's motion.

**Facts**

The Court conducted an evidentiary hearing on Littledale's motion on June 11-12, 2009 and finds the facts as follows.

Immigration and Customs Enforcement (ICE) agents obtained a search warrant for a residence located at a particular address in Hanover Park, Illinois, based upon a showing of probable cause that an individual using the screen name "neodmoney" and using a computer located at that address had been sending and receiving online child pornography and claimed to be molesting his nine-year-old niece. The agents' initial investigation suggested that "neodmoney" likely was an individual by the name of Richard Ahrens who resided at the Hanover Park address (this turned out to be incorrect). The warrant application stated that Ahrens was living at the home along with Cynthia Littledale, who was identified in the application as the subscriber of the Internet

Protocol address that "neodmoney" was using.  The application also identified Ahrens' brother, Dale Ahrens, as having been seen at the home.  The warrant application did not mention Daniel Littledale at all.

ICE special agent Jennifer Sapper led a team of agents who executed the search warrant at approximately 9:00 a.m. on March 9, 2007.  Before going to the residence, the agents believed that Richard Ahrens was the target of their investigation.  Agent Sapper testified credibly that before executing the warrant, law enforcement had conducted a query that indicated that Daniel Littledale was living at the home but that the investigators did not consider him to be a target of the investigation.

Upon arrival at the residence, ICE agents found only Richard Ahrens to be present.  Agent Sapper identified herself to Ahrens, informed him that ICE agents were there to execute a federal search warrant for child pornography, and gave Ahrens *Miranda* warnings.  Following the entry into the Hanover Park home, ICE agents attempted to locate and make contact with both Cynthia Littledale and Dale Ahrens, hoping to question them and Richard Ahrens simultaneously.  Agent Sapper stayed with Richard Ahrens at the home and questioned him for about an hour and a half.

Via their search, the agents learned that there were two computers at the home, one in a bedroom that they learned belonged to Daniel Littledale (Cynthia's son), and one in a guest room.  Around 10:30 a.m., agent Sapper directed agents Demetrius Flowers and Tim Morris to locate and interview Littledale, who the agents had learned was attending classes at College of DuPage.  Agent Sapper testified that it is standard operating procedure in an investigation involving the transmission of child pornography via computer to interview all persons with access to the subject computer.  That said,

once the agents learned that one of the two computers in the home was in Daniel Littledale's room, agent Sapper had reason to suspect his involvement in illegal activity. The Court also notes that it appears that at the detention hearing in this case, Sapper testified that when told why the agents were at the home, Richard Ahrens suggested that they should be looking at Daniel Littledale. In addition, Sapper testified at the hearing before this Court that around 11:30 a.m., during the continuation of his interview at the Hanover Park police department, Ahrens advised the interviewing agents that he was computer illiterate and that Daniel Littledale had set up the computers at the home.

Agents Flowers and Morris called College of DuPage and spoke with campus police. They advised the campus police that they were working on a child pornography investigation and that they needed to speak with Daniel Littledale, a student at the school, about his involvement. Officer Rick Spiers testified that the agents advised that Littledale was a possible suspect in the investigation. Agents Flowers and Morris traveled to the college to interview Littledale. Prior to their arrival at the college, campus police ascertained what class Littledale was attending.

After the agents arrived at the college, they met with officer Spiers. Two campus police officers accompanied the agents to Littledale's classroom, which was in an adjoining building connected to the building that housed the office of the campus police. Both the agents and the officers were armed and in uniform. The officers were clothed in their standard campus police uniforms; the agents wore jeans and ICE t-shirts.

One of the campus police officers entered the classroom and advised the professor that he (the officer) needed to see Littledale. The professor indicated to

3

Littledale to leave the classroom. Littledale retrieved his belongings and followed the campus police officer into the hallway, where the other officer and the two ICE agents were waiting. The campus police officer told Littledale that the agents would like to speak with him. The agents identified themselves to Littledale and displayed their credentials, and they informed him that they needed to speak to him. Littledale agreed. Agent Flowers said that he did not want to speak with Littledale in the hallway and asked if Littledale would accompany them to the campus police office. Littledale again agreed. The agents and officers did not touch, handcuff, or physically restrain Littledale, nor did they raise their voices or display their weapons. They did not advise Littledale that he was free to leave, but they did not tell him that he was under arrest and did not tell him that he was required to accompany them. Littledale did not ask if he could leave and did not attempt to leave either before or after arriving at the campus police office.

As indicated earlier, the classroom where the agents located Littledale and the campus police office were housed in adjacent but connected buildings. The two ICE agents and the two campus police officers walked with Littledale to the campus police office. Officer Spiers testified that Littledale was "escorted" to the police office. The walk to the police office took about five minutes.

Entry to the police office is security-controlled. Approximately two to five officers are present in the office at any given point in time; typically, all of them are armed. The office has the appearance of a police station.

Though Littledale was carrying a backpack, no one searched it or Littledale before or after he entered the campus police office. Upon arrival, one of the officers

4

directed Littledale and the agents to an office. The office contained a desk and chairs and personal items; it was not a room dedicated to interviewing witnesses or suspects. Littledale and the two agents entered the office, and the three sat down around the desk. The agents shut the door after entering the room.

The two ICE agents again identified themselves and their office. They advised Littledale that they wanted to ask him some questions. They did not advise Littledale that he was free to leave or that he could decline to talk to them. Littledale did not express any objection or reluctance to answering the agents' questions. Nor did he ask to speak with anyone else. At no time during their questioning of Littledale did either of the agents raise their voices, nor did they make any express or implied verbal or physical threats.

The agents did not give *Miranda* warnings to Littledale prior to commencing the interview. When asked why, they said that they did not believe they were required to do so because they did not have Littledale in custody. In response to questioning, Littledale provided information regarding the number and location of computers in the Hanover Park home. He also provided information regarding the particulars of the two computers and about the user name and password he used for Internet service. The agents then questioned Littledale about the presence of child pornography on a computer in the home. Littledale told the agents, in response to questions, that he had seen child pornography on one of the computers and that he had been sending and receiving child pornography for approximately six years. The agents asked Littledale questions about where the child pornography was located on his computer and what user name he used (he said he used the name "neodmoney"). At this point, at

5

approximately twenty-five minutes into the interview, the agents stopped questioning Littledale and read him the *Miranda* warnings. Agent Flowers testified that he decided to read *Miranda* because Littledale had made incriminating statements. Agent Morris testified that it is his usual practice, in non-custodial interviews, to read *Miranda* warnings to an interviewee who has begun to make self-incriminatory statements.

Littledale acknowledged his rights, signed a written waiver, and agreed to continue to speak with the agents. After obtaining the *Miranda* waiver, the agents again went over some of the information that Littledale had already given them and also asked more detailed questions about his receipt of child pornography. Littledale subsequently produced a written confession.

The interview ended about two hours and fifteen minutes after it started. The agents informed Littledale that he was not under arrest and was free to leave. Littledale left the police station unescorted.

Littledale had turned twenty years old about three weeks before the interview. The undisputed evidence submitted at the hearing reflects that he suffers from Asperger's Syndrome, an Autism Spectrum Disorder. Reports submitted by medical experts for both Littledale and the government indicate that Littledale has difficulty with verbal reasoning and adaptive functioning, which likely had a negative impact on his ability to understand *Miranda* rights and their implications. The expert reports also reflect that Littledale's inability to think abstractly and assess social situations make him particularly vulnerable to coercive tactics. When questioned by authority figures such as law enforcement officers, Littledale's inclination is to answer questions automatically, rather than to think independently about the implications of those answers.

**Discussion**

Littledale argues that the statements he made prior to being given *Miranda* warnings should be suppressed because *Miranda* warnings were required and that the mid-interrogation *Miranda* warnings were ineffective under *Missouri v. Seibert*, 542 U.S. 600 (2004), thus rendering the post-warning statements inadmissible as well. Littledale also contends that the latter statements should be suppressed because he did not knowingly and intelligently waive his right to remain silent.

A person subjected to custodial interrogation by law enforcement officers must be informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The suspect must be both in "custody" and subjected to "interrogation" before *Miranda* warnings are required. *See, e.g., United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002). Littledale contends that his Fifth Amendment right against compulsory self-incrimination was violated due to the lack of *Miranda* warnings before the interview, thereby rendering the resulting statements inadmissible in evidence. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985). A threshold issue is whether Littledale was in custody when he was questioned at the campus police office.

*Miranda* warnings are required when law enforcement officers question a person who is in custody or otherwise deprived of his or her freedom of action in a significant way. *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *Miranda*, 384 U.S. at 444; *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007). Littledale bears the

burden of proving that he was in custody. *See United States v. Bassignani*, 560 F.3d 989, 993 (9th Cir. 2009); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984).

The inquiry regarding whether a person was in custody for purposes of *Miranda* turns on whether or not a reasonable person in the circumstances would have believed that he or she was free to leave. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). This test employs an objective standard. *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998). In other words, the question is not whether the particular defendant thought he was free to go, but whether a reasonable person in those circumstances would have so believed. *Id*. at 1159; *see Stansbury v. California*, 511 U.S. 318, 323 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned"). The subjective beliefs of the law enforcement officers regarding whether the defendant is in custody are irrelevant unless they conveyed their views to the defendant. *Michigan v. Chesternut*, 486 U.S. 567, 576 n.7 (1988).

In addition, the unique characteristics of the suspect, such as his age or a low IQ, are irrelevant to the determination of whether he was in custody. In *Yarborough v. Alvarado*, the Supreme Court concluded that consideration of such individual characteristics would "ignore the argument that [the] inquiry states an objective rule designed to give clear guidance to the police [of when a suspect is in custody], while consideration of a suspect's individual characteristics – including his age – could be viewed as creating a subjective inquiry." *Yarborough v. Alvarado,* 541 U.S. 652, 654 (2004); *see also Salyers*, 160 F.3d at 1159 (inappropriate to consider a person's military

8

experience, during which he was trained to obey orders from authority figures, in determining whether he was in custody). Thus, the question is not whether Littledale, given his mental or behavioral limitations, thought he was free to go, but whether a reasonable person in the circumstances would have so believed.

Factors relevant to the determination of whether Littledale was in custody include whether 1) the encounter occurred in a public place; 2) Littledale consented to speak with the officers; 3) the officers informed Littledale that he was not under arrest and was free to leave; 4) he was moved to another area; 5) there was a threatening presence of several officers and a display of weapons or physical force; 6) officers deprived Littledale of documents he needed to continue on his way; and 7) the officers' tone of voice was such that their requests would likely be obeyed. *Barker*, 467 F.3d at 628-29. The Court must also take into account any intimidation or coercion on the part of law enforcement officers. *Salyers*, 160 F.3d at 1159.

Though some of these factors tilt in favor of a finding that Littledale was in custody, the totality of circumstances surrounding his interaction with agents Morris and Flowers do not reflect that Littledale was in custody when the agents questioned him. The Court is unpersuaded that Littledale was deprived of his freedom in such a way that a reasonable person facing the same circumstances would have believed that was not free to leave.

The ICE agents who questioned Littledale first encountered him in a public area, specifically, a public hallway at College of Dupage. Though there is some evidence to indicate that a professor, at the best of officer Spiers, directed Littledale to leave his classroom, there was credible evidence showing that once Littledale was in the hallway,

the agents asked if he would accompany them and neither directed him to do so nor made any coercive or intimidating show of force.

The ICE agents did not advise Littledale that he was free to leave, a relevant factor in determining whether a reasonable person under the circumstances would have felt free to leave. On the other hand, the agents did not tell Littledale that he was under arrest or that he could not leave. In addition, Littledale did not ask if he could leave and made no attempt to do so. These are factors supporting a determination that he was not in custody when questioned. *See Salyers*, 160 F.3d at 1159-60 (the fact that the defendant was not told he could not leave, did not ask if he could leave, and never attempted to leave supports a finding that the defendant was not in custody).

The agents and campus police officers were armed when throughout the encounter, and Littledale was confronted by four of them when he came out of the classroom. On the other hand, at no point during the entire course of events did the agents or officers draw or put their hands on their weapons or threaten to use any kind of physical force. In addition, the officers never touched Littledale. They did not physically compel Littledale to follow them to the police office. In short, Littledale was not deprived of his freedom to anywhere near the extent associated with a formal arrest.

The fact that Littledale was questioned in a police station is relevant, but *Miranda* warnings are not required simply because the questioning takes place in a station house or in a coercive atmosphere. *Oregon v. Mathiason*, 429 U.S. 492, 492-93 (1977). Littledale voluntarily spoke with the agents, which tends to indicate that a reasonable person under the circumstances would have felt free to leave or end the

conversation. *See Barker*, 467 F.3d at 629 (determining that the defendant was not in custody in part because he consented to speak with the officers).

The evidence regarding the agents' demeanor during questioning also supports the government's contention that Littledale was not in custody. The credible evidence shows that when speaking with Littledale, the agents never once raised their voices or speak to him in a threatening tone or manner.

In addition, Littledale was not deprived of any belongings such that it would have been difficult for him to leave. Upon entering the police office, neither the agents nor the officers seized Littledale's backpack or even searched it. The fact that Littledale left freely and without an escort at the end of the interview supports a determination that he was not in custody during the questioning process. *Mathiason*, 429 U.S. at 495 (the fact that the defendant was able to leave the police station at the close of the interview supports a finding for lack of custody).

In sum, the evidence reflects that Littledale was not in custody. A reasonable person in the circumstances would have believed that he was free to leave. For this reason, the agents were not required to give him *Miranda* warnings, and their failure to give those warnings until after he had made incriminating statements does not render his statements inadmissible.

Because the Court has concluded that *Miranda* warnings were not legally required, the Court need not address the other issues Littledale has raised.

## Conclusion

For the reasons stated above, the Court denies Littledale's motion to suppress

[docket nos. 32, 40 & 46]. The case is set for a status hearing on July 30, 2009 at 1:30 p.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 13, 2009